UNITED STATES, Appellee

v

WILLIE L. JAMES, Private, U. S. Army, Appellant

14 USCMA 247, 34 CMR 27

No. 16,784

November 29, 1963

*Captain Charles W. Schiesser* argued the cause for appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Lieutenant Colonel Ralph Herrod.*

*Captain Peter J. McGinn* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis M. Cooper* and *Captain Charles D. Reaves.*

QUINN, Chief Judge:

The accused was convicted of rape.[1] The question before us is whether the law officer erred to the accused's prejudice by denying a request for a two-day continuance.

At about 10:00 p.m., on July 28, 1962, Maria Schaepers, a twenty-one-year-old German girl, was suddenly accosted by two colored men. They seized her and dragged her across the road to a wooded area. While one man held her, the other raped her. The assault occurred near the main gate of the Panzer Kaserne in Boeblingen, Germany. Shortly thereafter, German police and Criminal Investigations Detachment agents searched the area of the assault. They found a hair barrette belonging to the victim and a wallet. The latter contained an identification card with the accused's picture, and numerous papers bearing his name.[2] Miss Schaepers identified the picture on the card as that of the man who held her. That evening in a lineup of five persons she picked out the accused as one of the attackers.

A few days after the lineup, a sweater was found in a wall locker in the accused's billet. It was "positively identified" by Miss Schaepers as that worn by the accused at the time she was assaulted. The locker was assigned to a man who was then on leave in the United States.

The record of the preliminary proceedings indicates the Government intended to introduce the sweater into evidence, and that the accused was prepared to defend against the Government's effort to connect him with it by a number of witnesses who would testify that, although closely associated with the accused, they had never seen him in possession of the sweater. The sweater was examined on several occasions before trial by both trial counsel and defense counsel, but neither noticed the name "M. D. Thomas" stitched on the inside of the lower border. On the morning of the trial, however, Government counsel discovered the name. He learned that Thomas had been recently transferred from the accused's company to another company in the same Kaserne. While he went ahead with the trial of the case, he arranged to have a CID agent bring Thomas to the courtroom and question him about the sweater. Coincidently, defense counsel made the same discovery a few hours later. He saw the name while handling the sweater during cross-examination of the Government witness who had found it. He called attention to the name in his examination of the witness, and established that Thomas was "assigned to the area" at the time of the offense.

Thomas, who is caucasian, appeared at the place of trial in the afternoon. During a recess, trial counsel informed defense counsel of Thomas' presence; that the Government would call him as a witness; and that Thomas would testify he sold the sweater to the accused. When court adjourned for the day at 4:35 p.m., defense counsel interrogated Thomas. In the course of the examination, Thomas identified a pair of pants, which the defense had introduced into evidence as Defense Exhibit B, as the pants he had sold to the accused at the same time he sold him the sweater.

Before the court-martial convened for the second day of trial, defense counsel moved for a continuance "of at least two days," because he did not "feel" he had had "sufficient opportunity to check into . . . .[Thomas'] background, his reputation for truth and veracity, and for the expected testimony." The law officer inquired into

---

[1] The court-martial imposed a sentence which included a dishonorable discharge and confinement at hard labor for ten years. The convening authority reduced the confinement to six years.

[2] At trial the accused admitted the wallet was his, but contended he had lost it sometime between the early afternoon and about 7:30 p.m.

the nature of Thomas' testimony, and ascertained that defense counsel had interviewed a number of persons as to Thomas' background. Commenting on Thomas' identification of Defense Exhibit B as the trousers he sold to the accused, the law officer indicated that the motion would be denied "unless something more comes up." At the same time, he granted defense counsel time to confer with Thomas' company commander. About forty-five minutes later court opened. Defense counsel informed the law officer he had had an opportunity to interview Thomas' commander. He further indicated he wanted to stand on his motion for a continuance, although he had no new matter to present. The motion was denied.

Thomas was called as a Government witness. He testified that in May or June of 1963, he sold the accused a sweater, which he identified as Prosecution Exhibit Number 11, and a pair of pants which were identified as Defense Exhibit B. On cross-examination, defense counsel made no inquiry into the circumstances of the sale, such as whether other persons were present and the terms of payment. He asked Thomas whether he had "ever lied to people" in connection with the repayment of money he owed them; whether he was the father of an illegitimate child;[3] and if he had ever borrowed money from the accused.

Whether a continuance should be granted rests within the sound discretion of the law officer. ██ United States v Daniels, 11 USCMA 52, 28 CMR 276. An application for a continuance based on reasonable grounds "should ordinarily be granted." United States v Nichols, 2 USCMA 27, 36, 6 CMR 27. Liberality of consideration is particularly called for in a capital case such as this. Here, the testimony of the new witness was a strong link in the chain of evidence against the accused. It was proper,

if not essential, for the defense to explore the general background of the witness and his specific relations with the accused. A two-day continuance for that purpose was not unreasonable. Counsel does not always have adequate opportunity to examine into and properly evaluate new, significant evidence that comes to his attention while the trial is actually in progress. See United States v Heinel, 9 USCMA 259, 26 CMR 39. The reasonableness of the defense request, however, is not determinative of the question before us; our concern is whether under the circumstances the law officer abused his discretion in refusing it. United States v Rogan, 8 USCMA 739, 25 CMR 243; United States v Nichols, supra, page 34. We turn, therefore, to the matters presented to the law officer.

The accused characterizes Thomas as a "surprise witness." The description is appropriate insofar █ as the accused did not expect Thomas to testify, but it is misleading in the implication that often attends the unexpected witness, namely, that the witness and his testimony are totally unknown to the accused. Manifestly, the extent of accused's previous knowledge of the witness' character and background and the availability of sources of information to verify or refute the proposed testimony are material factors in determining the need for, and the length of, a request for a continuance to meet the challenge of the "surprise witness."

The law officer was told the substance of Thomas' proposed testimony, including the fact that he had identified a pair of pants, already in evidence as Defense Exhibit B and stipulated as belonging to the accused, as the pants he had sold to the accused at the same time he sold him the sweater. He was also advised that defense counsel had questioned Thomas. Yet, in spite of the fact the accused was the purported purchaser, defense counsel was significantly silent about any intention to contest Thomas' testimony that the sale was made. This omission obviously im-

---

[3] On trial counsel's objection, the question and the affirmative answer were stricken from the record.

pressed the law officer.[4] He commented on this "connection" between Thomas and the accused. Implicit in his remarks is the conclusion that the real purpose for the continuance was to inquire into Thomas' general credibility. See United States v Frye, 8 USCMA 137, 139, 23 CMR 361. As to that, the law officer was informed defense counsel had access to Thomas' military records. Such records often provide material evidence of general character and reliability. United States v Barnhill, 13 USCMA 647, 33 CMR 179. The law officer also knew counsel had conferred with Thomas' First Sergeant and Personnel Officer. He gave counsel an opportunity to talk to Lieutenant Daniel S. Alkovich, who was Thomas' then Company Commander, and for four months previous thereto had been Thomas' platoon leader. He knew Thomas had been in the accused's immediate unit and that the accused had had dealings with him. He knew Thomas was still in the accused's Kaserne. Except for the generalized statement about checking the expected testimony, nothing was presented to indicate the defense intended affirmatively to challenge the substance of Thomas' testimony, although it involved a transaction with the accused. And there was much to show the defense already had substantial evidence of the general background of the witness. Although not mentioned in the arguments before the law officer, the record of trial, and an Article 38 brief (Article 38(c), Uniform Code of Military Justice, 10 USC § 838) filed by defense counsel, indicate defense counsel had also questioned a number of witnesses about Thomas' character and reputation, and they later testified that Thomas "lied" to them in connection with the repayment of money he owed them. Counsel further ascertained, as noted earlier in the opinion, that Thomas was the father of an illegitimate child, but he was also "an excellent soldier and made Colonel's Orderly whenever he wanted it." So far as the Government's endeavor to connect the sweater to the accused is concerned, we have already pointed out that the record shows the defense had before trial prepared in depth to prove that persons intimately associated with the accused had never seen the sweater in his possession. Without passing on the effect of the accused's failure to bring these matters to the law officer's attention, we put them entirely aside in considering the validity of the law officer's ruling. See United States v Wilson, 10 USCMA 337, 27 CMR 411. In passing, however, it is worth noting that not "to this day . . . [have] appellant's counsel suggested in what specific area of investigation or preparation, either legal or factual, it was reasonably necessary for the appellant to go into" besides those he already had exhausted. Joseph v United States, 321 F2d 710, 712 (CA 9th Cir) (1963). On the facts presented in this record, we cannot say that as a matter of law the law officer abused his discretion in denying the motion for a continuance. United States v Frye, supra; United States v Rogan, supra.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

The essence of the majority opinion is that a surprise witness, whose testimony is crucially important to the Government's case, may be sprung on the defense in the midst of a trial without affording the latter any opportunity to investigate or prepare to meet this new development. "To do that is not to proceed promptly in the

---

[4] The record shows that, in fact, in his direct examination on the merits the accused was not asked anything, and said nothing, in denial of Thomas' testimony. See Dyson v United States, 283 F2d 636 (CA 9th Cir) (1960). However, on cross-examination he denied buying the sweater from Thomas, and said he found the pants at Fort Dix, New Jersey, "laying across a bunk"; since everyone "was leaving" and the pants did not seem to belong to anyone, he took them.

calm spirit of regulated justice but to go forward with the haste of the mob,"[1] and if the defense is to be denied forty-eight hours in which to seek out a possible answer to the solid blow which has been unexpectedly dealt his case, the concept of judicial discretion has been reduced to a hollow mockery against which an accused, defended by the most competent counsel, is powerless to contend. It is shocking to justify the denial of a continuance upon the basis that the defense "already had substantial evidence of the general background of the witness" when it is entitled to meet the Government's accusation with any and all evidence which it may be able to uncover and adduce. Indeed, one may wonder how "substantial" its attack really was when the court-martial chose to believe the prosecution witness, find the accused guilty, and impose a sentence including ten years' confinement. I cannot be a party to approving such cavalier treatment of a request which even my brothers concede was reasonable.

According to the prosecutrix, on July 28, 1962, two Negro men dressed in civilian clothing forced her into the woods near Boeblingen, Germany, and while one held her, the other violated her person. After the act was consummated, both fled. The incident occurred at approximately 10:00 p.m., and the person who held her was the accused, "James, Willie." The points "I recognized about him, or the things I saw about him particularly were the eyes, the nose, and the sweater he wore." The sweater design consisted of "squarely arranged white stripes." She immediately reported the matter to the guardhouse at nearby Panzer Kaserne.

Returning with German and American police officers to the scene of the attack upon her, the victim noted an identity card had been found by Officer Binder. Upon her request, she was permitted to examine it and saw accused's picture thereon. On the same night, she was able to identify accused in a lineup of several Negro soldiers.

Officer Binder testified that he found accused's wallet, which contained his identification card, in the general area of the crime. A man's sweater of the type previously described by the prosecutrix was found in an otherwise vacant locker in accused's barracks on August 4, 1962. The prosecutrix positively identified it as the garment accused had worn on the night of the assault. In its lower edge was knitted the name, "M. D. Thomas," a former member of accused's company.

Thomas, called as a witness, by the prosecution, declared that he sold the sweater and a pair of trousers to James on July 26, 1962. It had been previously stipulated that the trousers in question belonged to the accused.

For the defense, it was established that the lineup from which accused was selected consisted of a total of five men. James was clean-shaven. The others all wore moustaches. Several witnesses testified that they lived in the same squadron with the accused, knew him well, and had never seen him with a sweater similar to the one allegedly sold him by Thomas.

Accused elected to testify in his own behalf. He denied committing the offense, declared that he had lost his wallet on the evening in question, and accounted for his whereabouts during the critical period. He further denied having purchased either the sweater or trousers from Thomas, stating that he had never seen the former item before and had obtained the latter in the United States.

Other witnesses were produced by the defense who supported accused's alibi and agreed that, on the night in question, he was not wearing the sweater allegedly sold him by Thomas. Finally, the prosecution and defense stipulated that clothing and shoes allegedly worn by the accused had been examined by Dr. H. H. Driesen, Scientific Assistant, Federal Agency for Criminal Investigation, Analysis and Research, and found to contain no traces of soil similar to samples taken from the scene of the offense.

[1] Powell v Alabama, 287 US 45, 59, 77 L ed 158, 53 S Ct 55 (1932).

In his summation, trial counsel referred again and again to the importance of the sweater as evidence of accused's guilt, characterizing it "in one sense perhaps even stronger than the billfold," and pointing out "there has been no showing that Thomas has any particular motive to misrepresent" selling the item to James. He concluded by declaring that the "physical evidence . . . speaks much louder than words, especially words stated by friends of the accused."

The continuance sought by the accused involves only the testimony of M. D. Thomas, whose name was knitted into the bottom of the fatal sweater. His name was not endorsed on the charge sheet as a witness, nor did he appear at the pretrial investigation. Indeed, the Government conceded at the trial that it first became aware of his identity immediately prior to the convening of the court-martial and did not make its intention to call him as a witness known to defense counsel until 4:00 p.m. on the first day of the proceedings. After the day's adjournment, defense counsel interviewed Thomas, spoke with his first sergeant, attempted to call his company commander, and examined his military records. When the court-martial reconvened on the following morning, an out-of-court hearing was held in which the defense moved for delay in the following manner:

"DEFENSE COUNSEL: We would like to move for a continuance of at least two days, sir, under the circumstances we did not become aware of the testimony of this witness until approximately 1600 hours yesterday afternoon. In that time we don't feel we've had a sufficient opportunity to check into his background, his reputation for truth and veracity, *and for the expected testimony that he will give,* and for this reason we think that a continuance of this length is in order, sir." [Emphasis supplied.]

Counsel made known to the law officer what had been done with respect to the witness in the period since adjournment, the substance of his expected testimony, and the fact that both attorneys were unaware of Thomas' connection with the case until the commencement of the trial.

Following the presentation of these matters, the law officer inquired whether there was "any other corroborative evidence available" concerning the sweater's sale. Trial counsel replied that Thomas vaguely thought another man may have been present, but "is not sure." He informed the law officer that the proposed witness stated he had also sold the accused the trousers which had already been admitted in evidence on behalf of the defense and which had been stipulated to be the property of the accused. After this transpired, the motion for continuance was thusly denied:

"LAW OFFICER: Did he say he sold the pants at the same time he sold the sweater?

"ASST DEFENSE COUNSEL: He did, sir.

"LAW OFFICER: And I take it there's a stipulation in evidence that those are the accused's pants? Was that stipulated?

"TRIAL COUNSEL: I think there's a stipulation to that effect, or that they were taken from his locker, or words to that effect.

"LAW OFFICER: Well, I'm sorry I can't grant any continuance, then, because you have already stipulated that those are the accused's pants, and I think that definitely ties up that there is some sort of connection between these two people. The witness will be here on the stand. You can cross-examine him. His company commander is available; you can talk to him. What is his name?

"TRIAL COUNSEL: Alkovich.

"DEFENSE COUNSEL: He's still being held, isn't he? He hasn't been excused?

"TRIAL COUNSEL: Yes.

"LAW OFFICER: I'll give you some time right now if you'd like to go talk to Lieutenant Alkovich.

"DEFENSE COUNSEL: Yes, sir, we'd like to.

"LAW OFFICER: And unless something more comes up, the motion for continuance cannot be granted; but I will give you some time now to talk to the accused's company commander, Lieutenant Alkovich, and if something new comes up, why of course I'll be glad to consider further motion for continuance.

"DEFENSE COUNSEL: Yes, sir."

Following his conference with Lieutenant Alkovich, defense counsel elected to stand on his motion for a continuance. It was then finally overruled.

I have elected to set forth a summary of the entire evidence in the case and the proceedings surrounding the ruling upon the motion for a continuance to demonstrate the importance of Thomas' testimony to the prosecution, the framework in which the motion was made, and the recorded reason of the law officer in denying the request for delay. And, contrary to my brothers' assertions, it cannot be stated that he did so on the basis they cite. Rather, he acted on the absurd ground that, as defense had stipulated the trousers were accused's property and Thomas would testify he sold both the sweater and pants to James on the same occasion, the defense necessarily had already conceded the truthfulness of his testimony. In short, without even hearing the witness, the law officer decided to believe his projected testimony, conclude that delay would avail the accused nothing, and order the trial to continue! It is under these circumstances that we should consider the propriety of his ruling.

Code, supra, Article 40, 10 USC § 840, provides that a court-martial "may, for reasonable cause, grant a continuance to any party for such time, and as often, as may appear to be just." And the Manual for Courts-Martial, United States, 1951, notes that the fact the defense "has not been . . . advised [prior to the trial] with respect to a witness who appears at the trial may be a ground for a continuance." Manual, supra, paragraph 44h. It adds, in paragraph 58d, that the question of a continuance "is one for the sound discretion of the court" but "refusal . . . to grant a continuance when reasonable cause is shown" may require a rehearing.

In United States v Daniels, 11 USCMA 52, 28 CMR 276, this Court extensively reviewed and summarized our former decisions in this area. In reversing because of the denial of a continuance to obtain the presence of a soon-to-be-available witness in lieu of using his deposition, we declared, at page 54:

"The granting or denial of a motion made at the trial for a continuance of court-martial proceedings lies within the sound discretion of the law officer. United States v Plummer, 1 USCMA 373, 3 CMR 107. Only when he abuses that discretion will we reverse for refusal of a reasonable delay. United States v Vanderpool, 4 USCMA 561, 16 CMR 135. And the erroneous denial of accused's motion must, of course, prejudice his substantial rights. United States v Nichols, 2 USCMA 27, 6 CMR 27. It is difficult to lay down any principle whereby the question of abuse of discretion may be precisely determined, for, as the very phrase imports, the exercise of judicial discretion depends upon the circumstances with which the law officer was faced. at the particular trial. *It may well appear that the defense counsel seeks only to vex the Government with needless delay in order to avoid the certain consequences of his client's misconduct. On the other hand, he may need further time to secure the attendance of material witnesses or to prepare his defense.* In either instance, it is obvious that the military trial judge should liberally grant motions for delay bottomed upon a proper showing. At the same time, he should not hesitate to insist upon proceeding if it is clear that there is little merit to be obtained from a post-

**253**

ponement. As we pointed out in United States v Nichols, supra:

'. . . We believe that law officers should weigh carefully the merits of a motion to continue and if it appears reasonable that it is not made on frivolous grounds or solely for delay, the request should ordinarily be granted. However, the burden still remains on the moving party to justify the motion. Counsel for accused has the responsibility to make a full and fair disclosure of the necessity for, and the nature, extent and availability of, the desired evidence. If he fails to do so, the law officer cannot be condemned.' " [Emphasis supplied.]

In United States v Plummer, 1 USCMA 373, 3 CMR 107, we specifically pointed out defense counsel's surprise at an "unexpected development" as a reason why the law officer erred to accused's prejudice in denying a requested overnight continuance. In like manner, we noted in United States v Nichols, 2 USCMA 27, 6 CMR 27, at page 36, reasonable requests for delay should "ordinarily be granted," provided counsel has carried his burden of making "a full and fair disclosure of the necessity for, and the nature, extent and availability of, the desired evidence."

It was precisely such circumstances which led the Circuit Court of Appeals to find an abuse of discretion in denying a motion for continuance when the Government, in a suddenly filed bill of particulars, named new witnesses as having been involved in defendant's criminal behavior. United States v Neff, 212 F2d 297 (CA 3d Cir) (1954). The ruling, Judge Kalodner said, at page 310, was "in violation of well-settled principles designed to preserve the rights of accused persons." Undoubtedly, he referred, as did the court in Foster v United States, 296 F 2d 65 (CA 5th Cir) (1962), "to the granting of a continuance to prevent unfair results flowing from surprise arising during the trial." Id., at page 68. And, as was succinctly stated in

Paschen v United States, 70 F2d 491 (CA 7th Cir) (1934), at page 494:

"The court in its sound discretion always has power, and it is its duty, to protect a defendant against surprises in the development of the Goverment's case, and against a defendant being placed in position where he is at an unreasonable and unfair disadvantage. If further time is necessary to enable the defendant to meet unexpected developments, reasonable postponement may and should in a proper case be granted; and, indeed, where it is plainly apparent that a defendant is surprised by certain evidence, and is thereby placed at an unfair disadvantage through being thus unprepared to meet it, in a proper case the evidence may, on objection, be refused admission. . . ." [Emphasis supplied.]

In State v Edwards, 54 NM 189, 217 P2d 854 (1950), at page 856, the Supreme Court of New Mexico declared:

". . . When it is made to appear that testimony of the witness is such that it cannot be reasonably anticipated, postponement or continuance of the hearing is available to a defendant to meet it and if application therefor is denied, prejudice being shown, reversal will follow."

Thus, the defendant is entitled to an opportunity to "meet and defend against the case now sought to be made." Claxton v State, 94 Tex Crim 393, 251 SW 1106, 1107 (1923). See also Fagan v State, 112 Tex Crim 107, 14 SW2d 838 (1929), and State v Willis, 37 Wash 2d 274, 223 P2d 453 (1950). It is these authorities, as well as ordinary common sense, which lead me to conclude that the law officer's action in denying the requested forty-eight hour delay was arbitrary and capricious. As outlined above, he was made aware of the genuine surprise on the part of the defense, occasioned by the production of Thomas, the extremely damning nature of his testimony, and the precisely stated need for "a sufficient opportunity to check into his background, his reputation for truth and veracity, and for the expected testimony that he will give."

(Emphasis supplied.) He also made known the fact he had succeeded in uncovering some evidence during the overnight adjournment but had been unable to go further in the limited time available. How much more showing can any lawyer be required to make on such brief notice? Counsel did not even become aware of the witness' existence until the previous evening. His subsequent exertions turned up some grist for his mill, but it should be painfully evident to all that an honest attorney cannot predict what investigation of a previously unknown witness' testimony will evolve. What is needed is a fair opportunity to look into its substance, the witness' background, and his reputation—in short, to "meet and defend against the case now sought to be made." Claxton v State, supra. Are we then to say that, in order to have a continuance to meet important evidence which has caught the accused by surprise, it is necessary for defense counsel to indulge in wild speculation and, without any basis, to assure the court that he will be able to produce proof that the witness is a rogue bent upon lying an innocent party into prison or, indeed, to the gallows? I cannot believe the law is so demanding or so ignorant of the realities of a criminal trial.

Indeed, with the showing made to him, I can find no reason for the law officer to deny the defense motion. He purported so to act only on the basis that the accused had already conceded ownership of the trousers, which it was expected Thomas would testify he sold him along with the sweater. What bearing this has on the continuance, I am at a loss to determine, for, unless the trial Judge had already decided to believe the Government's case and to convict accused out of hand, James' admission of owning the pants carried with it no taint of buying them from Thomas. The latter situation might present a far different case, but it was Thomas' testimony to that effect which the defense quite clearly wished to rebut. And, accused himself later denied purchasing either garment from Thomas.

The sum total of the situation pre-sented to the law officer, then, is, in my opinion, a conclusive demonstration of the defense need for delay to meet a new onslaught unexpectedly directed at the accused. Not the slightest justification is shown in the record for the denial of that opportunity and, under the authorities gathered here, I can only conclude that the law officer's ruling was a serious abuse of discretion. United States v Daniels, supra; United States v Plummer, supra.

Turning to the question of prejudice, there can be no doubt as to the harm done this accused's case. Although the other evidence shows accused's wallet was found on the scene and an identification by the victim, the former was explained in his testimony and the latter was seriously impeached by the peek at the identification card and a pretrial lineup which even the staff judge advocate characterized as "a complete farce." In addition, accused adduced evidence of an alibi, supported by the testimony of several witnesses. In light of these factors, it is not at all surprising to find the trial counsel harping upon Thomas' testimony and the sweater in his final argument and urging it upon the court as the key evidence in the case. Prejudice is, therefore, undoubtedly present and I would reverse the conviction.

In reaching this decision, I have not lightly overlooked the rationale of the principle opinion. It is neither logical nor well grounded. Thus, when it finds significance in the failure of defense counsel to cross-examine Thomas on the circumstances of the sale, I suggest it is more reasonable to infer the lack of inquiry is bottomed upon the equal lack of opportunity to develop material for such examination, in turn occasioned by the denial of the continuance. And that it is able to find only a purpose "to inquire into Thomas' general credibility" simply does not accord with the record set out above, nor does the statement that the law officer "had nothing before him to indicate the defense intended to challenge the substance of Thomas' testimony." At the risk of being repetitive, I point out accused's counsel

**255**

quite specifically stated he wished to investigate both credibility and Thomas' projected testimony. Finally, I reiterate my shock at denoting as "substantial evidence" the few wisps of testimony which counsel had assiduously garnered in the short time available, *i.e.*, that Thomas had lied on several occasions about his intention to repay borrowed funds. The effect of such "evidence" is, as noted, reflected in the verdict.

Nor does the fact that the accused previously knew Thomas and was aware of his background bear materially upon the issue of granting the continuance. In seeking evidence, it is what others, rather than the defendant, know which is relevant in destroying credibility and refuting damaging proof. And even my brothers concede that the description of Thomas as a surprise witness "is appropriate insofar as the accused did not expect Thomas to testify." Under these circumstances, it would seem essential to grant an opportunity to the defense to find those who could support accused's obviously interested declarations that Thomas was not to be believed.

Finally, I cannot let my brothers' invocation of a seemingly apt quotation from Joseph v United States, 321 F2d 710, 712 (CA 9th Cir) (1963), pass unchallenged. Unlike the case before us, that controversy did not involve a witness whose identity and value to the Government was made known for the first time in the middle of the trial. Rather, the question was one of the trial judge's discretion in refusing a general motion for continuance at the outset of the proceedings, when counsel had had two weeks in which to prepare and, upon inquiry, did not point out "any specific areas of investigation, research, or preparation which the facts of this case required." Joseph v United States, supra, at page 711. In short, counsel for the defendant sought a general continuance and failed utterly to show any ground for it despite repeated and detailed inquiry on the part of the District Judge. Denial of the continuance was practically demanded in light of such facts, but it is difficult to see where the decision offers the slightest authority for refusal of a brief delay when the evidence proffered by the Government is totally unexpected, could not reasonably be anticipated, and the area of investigation was marked out as precisely as the circumstances permitted. I remind my brothers that military courts-martial, like state courts, must accord the accused a fair hearing. Burns v Wilson, 346 US 137, 97 L ed 1508, 73 S Ct 1045 (1953). In my opinion, the denial of the continuance in this case prevented such a trial.

In sum, then, I am compelled to conclude that the law officer prejudicially abused his discretion in denying the accused a relatively brief continuance during which to investigate new evidence which came as a surprise to him and upon which the prosecution relied so heavily in obtaining the findings of guilty. I believe that my brothers here set a regrettable precedent, for, if this record demonstrates no abuse of discretion, then law officers are apparently free to act as they please in disposing of the best grounded requests for delay.

I would reverse the decision of the board of review and order a rehearing.